IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|                                    |                              |
| MICHAEL CARTER,                    |                              |
|              Petitioner,           | Case No. 10 C 3783           |
|         v.                         |                              |
|                                    | Hon. Harry D. Leinenweber    |
| LEE RYKER, WARDEN, LAWRENCE        |                              |
| CORRECTIONAL CENTER,               |                              |
|              Respondent.           |                              |

## MEMORANDUM OPINION AND ORDER

Petitioner Michael Carter ("Carter") was convicted by a Cook County, Ill., jury of first-degree murder following a joint jury trial with his brother and co-defendant, Michael Stone ("Stone"). Carter was subsequently sentenced to thirty years in prison. After an unsuccessful appeal and post-conviction petition, he filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting eight possible grounds for relief.

## I.  BACKGROUND

The following factual summary is drawn from the facts set forth by the Illinois Appellate Court in its order affirming Petitioner's conviction, *People v. Stone and Carter*, No. 1-03-0353 & 1-03-0402, cons.  Friday Gardner ("Gardner") was fatally shot on September 12, 1999, following a dispute that arose from a robbery of the Chicago apartment where Stone and others were living.

Carter and Stone came to suspect that Gardner was involved in the robbery, in which money, jewelry, and marijuana were taken. However, other testimony indicated that Gardner had tried to help another resident of the apartment chase down the thieves.

Later that evening, Carter, Stone, and another man, Cortez Jones ("Jones"), apparently broke into Gardner's van and stole his radio. A heated confrontation ensued and Gardner was fatally shot. Several witnesses gave conflicting versions of what occurred, and some recanted their original statements to police at trial. Because of the nature of Petitioner's claims, the Court will go into some detail as to the witness's testimony.

Lenisha Pearson ("Pearson"), who was Gardner's girlfriend, testified that Carter and Jones were arguing with Gardner for about 20 minutes when Stone walked out from a nearby alley and started shooting. Pearson said she heard two shots, followed by three more shots from the area where Carter and Jones were standing. Pearson said she could not tell who was responsible for the second set of shots because Carter and Jones were standing close together. Pearson testified that she did not see anything in Gardner's hands at the time of the shooting.

Rena Phillips and her son Antonio Phillips also testified that they saw the confrontation. Rena Phillips said she saw Jones and Carter shoot Gardner. Antonio Phillips, who was a relative of Gardner, testified that he saw Jones shoot Gardner, then saw Carter

pull out a gun.  He heard two more shots and then saw Carter and Jones flee.  He never saw Gardner with a gun at any time on the night he was killed.  Tommy Gaston ("Gaston"), a friend of Gardner's, testified that he saw Jones fire at Gardner, then heard a second round of approximately four more shots.  He never saw Gardner with a gun.

Felicia Anderson ("Anderson"), a cousin of Stone and Carter, denied seeing the shooting when she testified at trial.  She further testified that Gardner had a gun at the time of the confrontation, and a man she could only identify as "Tommy" removed the gun from Gardner's hand after he was shot.  In a handwritten statement given to Assistant State's Attorney Lawrence O'Reilly ("O'Reilly") on the night of the shooting, however, Anderson said that she saw Carter point a gun at Gardner and that after the shooting, she yelled, "[Carter] shot him."  Her grand jury testimony was consistent with her signed statement.

LaTonya Cheeks ("Cheeks"), also a cousin of Carter and Stone, testified at trial that the shooting was in self-defense.  However, she provided O'Reilly with a handwritten statement saying that she saw Stone shoot Gardner and that after the initial shots were fired she saw more gunfire from the area where Carter and Jones were standing.  In the statement, Cheeks said that Gardner had nothing in his hands at the time of the shooting.  Her grand jury testimony was consistent with her signed statement.  She testified that she

was tired when she gave her statement, and that the only reason she signed it was so she could go home. Cheeks also testified that she told O'Reilly and police that she saw Gardner pull out a gun during the argument, but they failed to include that information in her statement.

O'Reilly testified that he took Felicia Anderson's statement and that she told him the only one she saw with a gun was Carter, and that she never saw anything in Gardner's hands. Similarly, he testified that Cheeks never told him that Gardner had a gun at the time of the shooting or that she believed the shooting was in self-defense.

Michelle Anderson ("Anderson"), another cousin of Stone and Carter, testified on their behalf. Anderson testified that she observed a heated argument between Gardner and Jones and Carter that went on for 30 minutes. At some point, Anderson saw Gardner pull out a gun. Immediately after that, a man ran out of the alley and shot Gardner. Jones and Carter fled while a man she knew as "Tommy" took the gun from Gardner's hands and then drove off. She testified that she did not tell the police what she saw because other relatives had been intimidated by the police.

Stone testified on his own behalf. He said that on the evening of the shooting he was at home at 6102 S. May Street when he looked outside the window and saw Gardner arguing with Jones and Carter. He grabbed a gun that he said he had purchased for

protection earlier that day from a "dope fiend."  He then went outside and stood in the middle of the alley.  At some point during the argument, he saw Gardner look in his direction and pull out a gun.  Stone said he shot Gardner because he was afraid for his safety and that of his brother, Carter.  Stone also testified that he did not see Carter with a gun at the time of the shooting.  On cross-examination, Stone testified that he, Carter, and Jones were upset about the break-in at the apartment, and that Carter and Jones believed Gardner was involved in it.  Stone further testified that some of the marijuana taken from the apartment was packaged for selling.  Stone denied selling drugs himself, but said "herb was running through the house."  Because he was scared for his safety, he bought a gun within hours of the robbery for "three bags of rocks."  Stone said he believed he was acting in self-defense by shooting at Gardner after Gardner pulled out a gun.  Additional facts, including those raised in Carter's post-conviction petition, will be discussed where relevant.

Both Stone and Carter were convicted of first-degree murder, and both were sentenced to 30 years in prison.  Jones was tried and convicted separately.

Carter now seeks habeas relief on eight grounds:  (1) actual innocence;  (2) that he was denied a fair trial when the state elicited evidence concerning the marijuana robbery;  (3) that he was denied a fair trial because the state was allowed to introduce into

evidence the signed statements and grand jury testimony of Felicia Anderson and Cheeks; (4) that he was denied a fair trial when the trial court refused to admit into evidence a prior consistent statement made by Stone; (5) that his trial counsel was ineffective for failing to present exculpatory evidence; (6) that he was denied a fair trial because of comments made by the prosecutor during closing arguments; (7) that the appellate court improperly found that his Sixth Amendment rights were not violated; and (8) that his sentence is so excessive as to violate the Eighth Amendment. A habeas petition brought by Stone and raising similar claims was recently denied by U.S. District Judge Elaine E. Bucklo. *Stone v. Hardy*, 10 C 241, 2011 WL 91038, at *7 (N.D. Ill. Jan. 11, 2011).

## II. <u>STANDARD OF REVIEW</u>

Section 2254 of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") entitles a prisoner to a writ of habeas corpus if he is imprisoned pursuant to a state court judgment obtained in violation of rights guaranteed by the Constitution and laws of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Habeas relief is not available to remedy errors of state law. *Id.*

For any claim that was adjudicated on the merits in state court proceedings, a federal court may not grant a writ of habeas corpus unless the state court decision was (1) contrary to, or involved an unreasonable application of, clearly established

federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254 (d)(1),(2); *Ellsworth v. Levenhagen*, 248 F.3d 634, 638 (7th Cir. 2001).

Further, a petitioner seeking habeas relief must show that the state courts were given a full and fair opportunity to review his claims. *Johnson v. Loftus*, 518 F.3d 453, 455 (7th Cir. 2008). This means that the petitioner must exhaust all remedies available to him in state court. *Id.* Further, the petitioner must present all claims to the state court at the required time, or they are procedurally defaulted. *Id.* Procedural default also can occur when a state court rejects a claim on an independent and adequate state law basis. *Id.* When a petitioner defaults on a claim, a court may consider it only if he can establish cause and prejudice or show that the failure to consider the default would be a fundamental miscarriage of justice. *Id.* at 455–56. Finally, to preserve a claim for review, a petitioner must present the claim through one complete round of state court review, which in Illinois means it must be presented both in an appeal to the Illinois Appellate Court and in a petition for leave to appeal to the Illinois Supreme Court. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). If a petitioner fails to exhaust a claim, and complete

exhaustion is no longer possible, the claim is procedurally defaulted. *Id.*

### III. <u>DISCUSSION</u>

Petitioner's request for habeas relief must be denied because all of his claims are either not cognizable, procedurally defaulted, or meritless.

### A. Non-Cognizable Claim

Carter argues that he is entitled to habeas relief because he is actually innocent. However, actual innocence is not a freestanding basis for receiving habeas relief. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). As such, this claim is not cognizable.

### B. Procedurally Defaulted Claims

Several of Petitioner's claims are procedurally defaulted: (1) that he was denied a fair trial when the state elicited evidence concerning the marijuana robbery; (2) that he was denied a fair trial because the state was allowed to introduce into evidence the signed statements of Felicia Anderson and Cheeks; (3) that he was denied a fair trial when the trial court refused to admit into evidence a prior consistent statement made by Stone; and (4) that his sentence is so excessive as to violate the Eighth Amendment.

In determining whether a claim has been fairly presented to the state courts, the Seventh Circuit looks to whether the

petitioner: (1) relied on federal cases that engage in a constitutional analysis; (2) relied on state cases applying a constitutional analysis to similar facts; (3) framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Levenhagen*, 248 F.3d at 639. The presence of any one factor is not determinative, and the habeas court must decide whether the state court was "sufficiently alerted to the federal constitutional nature of the issue presented to permit it to resolve that issue on a federal basis." *Id.* (quoting *Verdin v. O'Leary*, 972 F.2d 1467, 1476 (7th Cir. 1992)).

Here, Petitioner's appeal challenged the trial court's evidentiary rulings as an abuse of discretion under state law. Petitioner cited only state court cases in his briefs to the appellate court, and those state cases do not apply a federal constitutional analysis. Although Carter generally argued that he was denied a fair trial, he did not specifically invoke the Fourteenth Amendment to challenge the trial court's evidentiary rulings, and "a passing reference" to a federal constitutional issue does not suffice to constitute fair presentment. *Harding v. Sternes*, 380 F.3d 1034, 1047 (7th Cir. 2004). Further, the Seventh Circuit has noted that "abuse-of-discretion arguments are ubiquitous, and most often they have little or nothing to do with constitutional safeguards." *Wilson v. Briley*, 243 F.3d 325, 328

(7th Cir. 2001).  As such, the Illinois Appellate Court would not have known that Carter was asserting constitutional claims.

Similarly, Carter did not invoke the Eighth Amendment in challenging his sentence on appeal, but rather asserted that the trial judge abused his discretion in sentencing Carter to 30 years in prison, and so he failed to preserve the issue for review. Moreover, Petitioner's sentence was within (and on the low end) of the sentencing range of twenty to sixty years in prison provided for first-degree murder by Illinois law.  730 ILCS 5/5-4.5-20.  As such, his sentencing claim was not only procedurally defaulted, but it is not cognizable. *King v. Cahill-Masching*, 169 F.Supp.2d 849, 855 (N.D. Ill. 2011).

Additionally, Petitioner forfeited two of his evidentiary objections when he failed to object at trial to the admission of either the marijuana evidence or the written statements and grand jury testimony of Cheeks and Felicia Anderson.  This is another form of procedural default.  Even though the state appeals court also addressed the issues on the merits, this constitutes an independent and adequate state law basis to reject the claims. *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002).

In order to overcome this procedural default, Carter must establish cause-and-prejudice or show that a fundamental miscarriage of justice would occur if this Court does not consider the claim.  *Perruquet v. Briley*, 390 F.3d 505, 514-15 (7th Cir.

2004). Petitioner contends that counsel was ineffective for failing to preserve his objection that the marijuana evidence was improperly admitted. Pet'r's Reply at 26. However, Petitioner fails to make any argument that would satisfy the test of *Strickland v. Washington*, 466 U.S. 668 (1984) and show that counsel's performance was both deficient and prejudiced him. *See Wrinkles v. Buss*, 537 F.3d 804, 812-13 (7th Cir. 2008) (noting that when a habeas petitioner seeks to excuse a procedural default because of ineffective assistance of counsel, the relevant standard for determining cause-and-prejudice is the *Strickland* test). Regardless, such an argument would fail because, as the appellate court held, the marijuana evidence was admissible under state law to show motive for the shooting. *See Garrett v. Acevedo*, 608 F.Supp.2d 1005, 1014-15 (N.D. Ill. 2009) (noting that if evidence admitted without objection is admissible under state law, the defendant cannot meet either prong of the *Strickland* test); *People v. Lovejoy*, 919 N.E.2d 843, 864 (Ill. 2009) (holding that other-crimes evidence is admissible if it is relevant for any purpose other than to show defendant's propensity to commit a crime).

Nor does Carter's claim of actual innocence serve as a gateway for consideration of this claim. In order to use actual innocence as a gateway to presenting a defaulted claim, the petitioner must show that it is more likely than not that no reasonable juror would

have convicted him in light of new evidence. *Schlup v. Delo*, 513 U.S. 298, 329 (1995). Petitioner's claim of actual innocence hinges upon the contentions he presented in his post-conviction petition. There, Carter argued that trial counsel was ineffective for failing to call exculpatory witnesses at trial. Carter presented two sworn affidavits from himself as well as affidavits from his co-defendants and a potential witness named Jeremiah McReynolds ("McReynolds"). He also presented police reports involving a potential witness named Paul Calmese ("Calmese"). *See* Ex. L at 5-8 (summarizing this evidence).

In the first affidavit, Carter contended that he was unarmed at the time of the shooting. He also said he gave his attorney McReynolds' name and told him he would offer exculpatory evidence, but his attorney failed to call McReynolds to testify. In his second affidavit, Carter alleged that Gardner was a gang member known for carrying weapons and having a temper. He said his trial counsel was aware of Gardner's background, but did not introduce evidence of it at trial.

In his affidavit, McReynolds said that he witnessed the argument that led up to Gardner's shooting from his first-floor window. During the argument, McReynolds said, Gardner pulled an object out from behind his back. McReynolds then heard shots coming from the alley. He said he did not see anyone other than Stone firing a weapon, and that when the shooting began Carter and

Jones "scatter[ed]" to avoid getting hit. McReynolds said he was available to testify as a witness, but was never called.

Co-defendant Stone, in his affidavit, took sole responsibility for the shooting and claimed it was in self-defense. Stone and Jones both attested that Carter was unarmed at the time of the shooting. Calmese, in police reports, said that he was standing next to Gardner when a vehicle pulled up. Carter was the driver; the passenger had a gun. Carter and Gardner began to argue. Calmese then saw someone else come out of a nearby building, stand in the alley and fire a gun at Gardner. The passenger also fired at Gardner, and then all three men fled.

However, despite these affidavits, Petitioner fails to meet the heavy burden required to establish a claim of actual innocence. *See Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) (holding that defendant must *demonstrate* innocence because the state has the benefit of the jury's verdict). To make out such a claim, a petitioner must have "new reliable evidence" in the form of trustworthy eyewitness accounts or exculpatory scientific or physical evidence that was not presented at trial. *Schlup*, 513 U.S. at 324. Petitioner claims the accounts of McReynolds and Calmese are such eyewitness statements, but they are merely cumulative of his defense at trial, where defendant argued that he was unarmed and did not shoot Gardner, and where the testimony of Michelle Anderson and Stone (and Felicia Anderson and LaTonya

Cheeks, to some extent) supported that defense.  Further, the testimony of several other eyewitness supported Carter's conviction.  *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (rejecting an actual innocence claim where petitioner claimed to have six alibi witnesses, but six other witnesses testified that he was the culprit).

In claiming actual innocence, Petitioner contends that Felicia Anderson and LaTonya Cheeks were intimidated by detectives into signing statements that they didn't even read.  Anderson testified that she was tired when she gave her statement and that Detective James O'Brien was "hollering" at her, while Cheeks likewise said she was pregnant, tired, and frustrated.  Ex. T at 600, 602, 611–12, 624—26, 686, 697–99.  Petitioner asks this Court to take notice of the fact that O'Brien and other officers involved in investigating his case have been named in an unrelated lawsuit pending in this district alleging police abuse, *Hill v. City of Chicago*.  Pet'r's Reply at 21–22, 43–44.  However, O'Brien is no longer a defendant in that suit following a summary judgment ruling in his favor.  *See Hill v. City of Chicago*, 06 C 6772, 2009 WL 174994, at *1 (N.D. Ill. Jan. 26, 2009).  Regardless, in the face of eyewitness testimony that Petitioner was involved in the shooting, this allegation of police misconduct cannot sustain a claim of actual innocence.  *See Escamilla v. Walls*, No. 00 C 3270, 2004 WL 2339321, at *3 (N.D. Ill. Oct. 14, 2004) (finding that even

evidence of "a pattern of police abuse" did not prove actual innocence in the face of eyewitness testimony linking petitioner to the crime).

## C.  Partially Procedurally Defaulted Claim

### 1.  *Prosecutorial Misconduct*

Petitioner contends he was denied a fair trial because of various comments made by the prosecutor in closing arguments. Although Petitioner does not list the offending comments in his habeas petition, on direct appeal he alleged that prosecutors:  (1) misstated the evidence as to how long witness Felicia Anderson was at the police station for questioning; (2) invoked the integrity of the State's Attorney's Office to urge a conviction and made inflammatory remarks urging the jury to convict to send a message; and (3) improperly shifted the burden of proof to the defense. Carter also argued on appeal that the cumulative effect of these improper statements required reversal of his conviction.

However, in his petition for leave to appeal to the Illinois Supreme Court, filed *pro se*, Petitioner referenced only his claim that prosecutors improperly shifted the burden of proof to the defense.  As such, Carter failed to present the other claims through one complete round of state court review, and they are procedurally defaulted.  *Harris v. Hinsley*, 04 C 1263, 2004 WL 1879056, at *7 (N.D. Ill. Aug. 17, 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

Petitioner's claim that prosecutors shifted the burden of proof fails on the merits. The first claimed error in this regard stems from a comment made by defense counsel in opening statements that forensic evidence would be presented regarding the lack of "stippling" on Gardner's body, which would indicate that Gardner was not shot at close range. Ex T. at 499–500. At trial, the defense presented no evidence on this point, but in closing arguments defense counsel argued that there was no evidence of close range firing based on the postmortem report. Ex. W at 1009–11, 1022, 1028. Then, in the state's closing argument, the prosecutor responded:

> THE STATE: But we're all going to look over here at close range firing to show, supposedly, that they're not guilty. You don't need it. That's why it's not there. That's why you were given [the medical] protocol, and that's all you need to know, because there is no argument about how Friday Gardner died, the manner of death. It doesn't matter about stipulating. *[sic]* It has nothing to do with anything. Put somebody on --
> . . . .
> [CARTER'S COUNSEL]: Objection.
> THE COURT: Overruled.
> THE STATE: If it is so important to your case, put somebody on the stand. You get to call people to the stand, Mr. Defense Attorney. You get to put whoever you want up there as a witness.
> [STONE'S COUNSEL]: Objection, shifting the burden.
> [CARTER'S COUNSEL]: Objection.
> THE STATE: Show the burden.
> THE COURT: Overruled.
> THE STATE: Call them. Or ask the person who is sitting up there, but don't ask if you don't want to know the answer, and then just argue it later on when you don't have any evidence about that.

Ex. W. at 1042–43.

The second claimed error arose from the state's response to comments by defense counsel during closing arguments in which counsel called into question Tommy Gaston's trial testimony that he never saw Gardner with a gun. Defense counsel implied that Gaston may have tampered with the evidence and removed Gardner's gun. Ex. W. at 1019-21. The state responded:

THE STATE: All the first couple of days you hear is that Tommy took the gun. Tommy took the gun. Well, when Tommy took the stand, Mr. Stone's attorney, right here, stood up and said, 'No cross.' Didn't ask him a single question. This is the person he has been waiting for. This is the man who took the gun that will show my client is acting in self-defense. He didn't ask him anything. Isn't that odd?

Ex W. at 1054.

In order to determine whether a prisoner is entitled to habeas relief based on improper comments by prosecutors, they must "so [infect] the trial with unfairness as to make the resulting conviction a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). Under *Darden*, a reviewing court must determine whether: (1) the prosecutor's statements were improper; and (2) the defendant was prejudiced. *Bartlett v. Battaglia*, 453 F.3d 796, 802 (7th Cir. 2006).

The state appellate court found the prosecutor's comment as to the lack of evidence of stippling was a proper response to the defense's unfulfilled promise to present such evidence. Further, the appeals court found that the comments in regard to Tommy Gaston

were invited by defense counsel's comments in closing arguments. In order to win habeas relief, Petitioner must show that this ruling was (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254 (d)(1),(2). Petitioner cannot make this showing because the prosecutor's comments were proper under federal law. *See United States v. Kelly*, 991 F.2d 1308, 1314 (7th Cir. 1993) (holding that prosecutors are "entitled to comment upon inconsistencies in the defense"); *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir. 1988) (holding that commenting on a defendant's failure to call or ask questions of a witness does not shift the burden of proof unless it taxes the exercise of the defendant's right not to take the stand). Nor does it matter that the appellate court did not cite federal law in rejecting Petitioner's claims of prosecutorial misconduct. An appeals court decision is not contrary to clearly established federal law as determined by the Supreme Court simply because the decision does not cite federal law. *Early v. Packer*, 537 U.S. 3, 8 (2002). The important issue is whether the reasoning or result of the ruling contradicts clear Supreme Court precedent. *Id.* In this case it did not.

Moreover, even if Petitioner could show that the statements were improper, he cannot show that he was prejudiced by them. In determining whether a defendant was prejudiced by improper comments, the court looks to several factors: (1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Bartlett*, 453 F.3d at 802. Here, the appeals court noted that not only did defense counsel invite the allegedly improper comments, but that the trial court properly instructed the jury as to the defendants' presumption of innocence, the state's burden of proof, and that closing arguments are not evidence. Further, the comments complained of here composed only a couple pages of transcript out of more than 50 pages containing the state's closing arguments. *See United States v. Young*, 470 U.S. 1, 11–12 (1985) (holding that prosecutor's remarks must be measured within the context of the trial as a whole in order to determine whether there was prejudicial error); *Bieghler v. McBride*, 389 F.3d 701, 707 (7th Cir. 2004) (finding no prejudice where the challenged comments "were but a mere blip" in a long trial). For these reasons, Petitioner's claim that the state impermissibly shifted the burden of proof to the defendant fails on the merits.

## D. Claim Rejected on the Merits

Petitioner contends trial counsel was ineffective for failing to call McReynolds and Calmese. As noted above, McReynolds' affidavit, submitted on post-conviction review, said that Stone shot Gardner after Gardner pulled out a gun, and that McReynolds did not see anyone else fire. The police report in regard to Calmese's statement says that Calmese told the officers that Carter's co-defendants shot Gardner. The appeals court found this testimony would have been merely cumulative of other evidence presented at trial.

The applicable law for determining whether counsel was ineffective is *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that in order to show ineffective assistance of counsel, a defendant must demonstrate: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) but for counsel's alleged errors or omissions, there is a reasonable probability the outcome of the trial would have been different. *Id.* at 688, 694. However, the Supreme Court has noted that on habeas review, this deferential standard becomes even more deferential because the question is not whether the state court ruling was incorrect, but whether it was unreasonable. *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009). Additionally, because the *Strickland* standard is a general one, a state court has more latitude to determine whether it has been

satisfied.  *Id.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Petitioner contends that because the record does not reflect why his trial attorney chose not to call McReynolds or Calmese, an evidentiary hearing is necessary.  The record does show, however, that Carter's trial counsel was aware of McReynolds prior to trial and at one point planned to call him as a witness.  Ex. Q at 181–83.  At that time, however, McReynolds was incarcerated in the Illinois Department of Corrections.  (He was freed prior to Petitioner's trial.)  Petitioner fails to address the strong presumption on *Strickland* review that counsel's conduct "falls within the wide range of reasonable professional assistance." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004).  In this case, counsel may have decided not to call McReynolds because of his criminal record, or he may have decided the testimony of Calmese and McReynolds was duplicative of other testimony indicating that the shooting was in self-defense.  Counsel also might have decided, as noted by the appellate court on post-conviction review, that the testimony of Calmese and McReynolds would have been unavailing because Carter was charged under an accountability theory, meaning that he could be found legally accountable for his co-defendant's actions even if he did not fire at Gardner.  Petitioner has not overcome the presumption that counsel's decision not to call these witnesses was reasonable.  *See*

*United States v. Weaver*, 882 F.2d 1128, 1139–40 (7th Cir. 1989)
(holding that counsel's decision not to call a witness rarely
amounts to ineffective assistance of counsel); *Evans v. Pierce*, 06
C 259, 2008 WL 779539, at *9 (N.D. Ill. March 20, 2008) (finding
that counsel's decision not to call an alibi witness with a
criminal record was reasonable).

Nor can Petitioner show he was prejudiced by counsel's failure
to call McReynolds and Calmese.  Petitioner argues that McReynolds'
testimony is important because the witnesses who testified that
Stone shot Gardner in self-defense were all related to Carter or
Stone.  Pet'r's Reply at 56—57.  However, Petitioner cannot carry
his burden to show that there was a reasonable probability that the
outcome of his trial would have been different if Calmese and
McReynolds took the stand.  Petitioner's self-defense theory was
fully presented to the jury and rejected by it, and the appellate
court was not unreasonable in finding that the statements of
Calmese and McReynolds would have added little to the case.
Moreover, as noted above, Petitioner was tried on an accountability
theory, and at least six witnesses, either in trial testimony or
statements to the police, said that Carter, Jones, or Stone fired
a gun at Gardner.  *See United States v. Donaldson*, 978 F.2d 381,
395 (7th Cir. 1992) (holding that failure to call a witness who
would have questioned the identification of defendant as bank

robber did not undermine court's confidence in the result where five eyewitnesses identified defendant as such).

Petitioner also claims that he is entitled to habeas relief because the appellate court improperly found that his Sixth Amendment right to counsel was not violated. The basis of this claim was not clear from Carter's initial petition. Under Rule 2(c) of the Rules Governing Section 2254 Cases, a habeas petition must specify all the grounds of relief available to the petitioner and the facts supporting each ground. Because Petitioner did not comply with this rule, the Court could decline to review the claim. *Reed v. Hathaway*, 596 F.Supp.2d 1200, 1207–08 (C.D. Ill. 2009). However, the claim is non-cognizable regardless. In his reply brief, Carter explains that this claim is based on his contention that the appellate court on post-conviction review misapplied state law and evaluated his petition under an incorrect standard. Pet'r's Reply at 55—56. However, even if Petitioner were correct, federal habeas relief is not available for errors that occur during state post-conviction proceedings. *Thomas v. Haws*, 97 C 7992, 2002 WL 199778, at *3 (N.D. Ill. Feb. 7, 2002) (citing *Penn. v. Finley*, 481 U.S. 551, 556–57 (1987)). Further, as discussed above, the appeals court's ruling on the merits of Petitioner's ineffective assistance of counsel claim was not an unreasonable application of federal law. As such, Petitioner's claims are denied.

## E. Certificate of Appealability

Because this Court has denied Petitioner's habeas claims, it must also consider whether to issue a certificate of appealability. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. This requires that the applicant make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to make this showing, the applicant must show that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court dismisses the petition on procedural grounds, it should issue a certificate of appealability when the prisoner shows: (1) that reasonable jurists would find it debatable whether the petition states a valid claim of the denial of a constitutional right; and (2) that reasonable jurists would find it debatable whether the district court was correct in its procedural ruling. *Id.* at 484-85. For the reasons discussed herein, Carter cannot make the required showing as to either his procedurally defaulted claims or those resolved on the merits. Finally, Petitioner filed a motion entitled "Motion for Leave to File an Amended Petition to Cure Error." It is unclear what Petitioner is seeking to amend, although he again asserts that he is actually innocent. Petitioner also asks that Respondent's Answer be stricken as it largely attacks his petition on procedural grounds, rather than on the merits. As there is nothing improper

about Respondent's Answer and as the motion adds nothing new to Petitioner's reply, it will be denied.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Petitioner's Petition for *Habeas Corpus* is denied and the Court declines to issue a Certificate of Appealability.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:**   2/9/2011